UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                            Case No. 8:21-cv-

APPROXIMATELY $1,951,930.94,

      Defendants.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 1956(c)(7)(F), as well as 18 U.S.C. §§ 981(a)(1)(A) and 1956(a)(1)(A)(i) and (B)(i), approximately $1,951,930.94, which includes the following assets ("Defendant Assets"):

    a.   Approximately $720,930.94 seized from JP Morgan Chase account number 259721709, in the name of Cure Healthcare, Inc. ("Cure");

    b.   $500,000 in lieu of the real property located at 125 Lakeside Drive, Buena Park, CA 90621;

    c.   $500,000 in lieu of the real property located at 39 Winward Way, Buena Park, CA 90621;

d. Approximately $111,000 from the sale of a 2020 Land Rover, Range Rover HSE, Vehicle Identification Number: SALGS5SE7LA592843, registered to Katrina Geronimo; and

e. Approximately $120,000 from the sale of a 2019 Mercedes-Benz S63 AMG, Vehicle Identification Number: WDDUG8JBXKA438216, registered to Sajid Q. Geronimo.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3. This Court has *in rem* jurisdiction over the Defendant Assets pursuant to:

a. 28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred in Tampa, Florida, within the Middle District of Florida; and

b. 28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4. Venue is proper in the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district.

## THE DEFENDANT ASSETS

5. The Defendant Assets constitute, or derive from, proceeds traceable to the commission of an offense prosecuted in this district. Specifically, Sajid Geronimo was charged by Information with one count of conspiracy to commit health care

fraud. Doc. 1, Case No. 8:20-cr-249-WFJ-JSS ("Criminal Case"). In the Information, Geronimo was put on notice of the United States' intent to forfeit any property that constituted, or was derived from, the gross proceeds traceable to the commission of the conspiracy. *Id.* Geronimo entered into a plea agreement with the United States in which he agreed to enter a plea of guilty as to the conspiracy charge and agreed to the forfeiture of any proceeds. Doc. 6, Criminal Case. Subsequently, Geronimo pled, and was adjudicated, guilty. Docs. 15, 23, Criminal Case. Ultimately, a Final Order of Forfeiture for each of the Defendant Assets, described below, was entered. Doc. 61, Criminal Case. However, Geronimo died before being sentenced.

6.      During the criminal investigation, approximately $720,930.94 was seized from JP Morgan Chase account number 259721709, held in the name of Cure, by the Federal Bureau of Investigation ("FBI") pursuant to a seizure warrant issued by the Court on April 9, 2020. Case No. 8:19-MJ-1434-JSS. Following entry of the Final Order of Forfeiture, the funds were deposited into the United States Department of Justice Asset Forfeiture Fund ("AFF").

7.      The real property located at 125 Lakeside Drive, Buena Park, California 90621 was found to constitute proceeds of the charged conspiracy in a Preliminary Order of Forfeiture for Direct Assets, entered on November 13, 2020. Doc. 26, Criminal Case. In lieu of the forfeiture of the Lakeside Drive property, Geronimo agreed to forfeit $500,000. Geronimo voluntarily turned over the funds to the United States Marshals Service ("USMS"), and the funds were deposited into the AFF after entry of the Final Order of Forfeiture.

8.     The real property located as at 39 Winward Way, Buena Park, California 90621 was found to constitute proceeds of the charged conspiracy in a Preliminary Order of Forfeiture for Direct Assets, entered on November 13, 2020. Doc. 26, Criminal Case. In lieu of the forfeiture of the Winward Way property, Geronimo agreed to forfeit $500,000. Geronimo voluntarily turned over the funds to the USMS, and the funds were deposited into the AFF after entry of the Final Order of Forfeiture.

9.     Geronimo voluntarily surrendered a 2020 Land Rover, Range Rover HSE, Vehicle Identification Number: SALGS5SE7LA592843, registered to Katrina Geronimo, to the USMS on February 19, 2021 at the FBI office located at 4000 W. Metropolitan Drive, Orange County, California 92868 in compliance with the Amended Preliminary Order of Forfeiture for Direct Asset entered on February 18, 2021. Doc. 36, Criminal Case. On July 12, 2021, the USMS sold the vehicle, and sale proceeds of approximately $111,000 were deposited into the AFF after entry of the Final Order of Forfeiture.

10.    Geronimo voluntarily surrendered a 2019 Mercedes-Benz S63 AMG, Vehicle Identification Number: WDDUG8JBXKA438216, registered to Sajid Q. Geronimo, to the USMS on February 19, 2021 at the FBI office located at 4000 W. Metropolitan Drive, Orange County, California 92868, in compliance with the Preliminary Order of Forfeiture for Direct Assets entered on November 13, 2020. Doc. 26, Criminal Case. On July 12, 2021, the USMS sold the vehicle, and sale

proceeds of approximately $120,000 were deposited into the AFF after entry of the Final Order of Forfeiture.

11.     Because the Defendant Assets are in the government's possession, custody, or control, pursuant to Supplemental Rule G(3)(b)(i), the Clerk of Court must issue an arrest warrant *in rem*.

## STATUTORY BASIS FOR FORFEITURE

12.     The Defendant Assets represent proceeds of a criminal conspiracy to commit health care fraud offenses set forth in 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349.

13.     The Defendant Assets are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. 18 U.S.C. § 981(a)(1)(C). A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7)(F), includes any act or activity constituting an offense involving a "Federal health care offense." Pursuant to 18 U.S.C. § 24(a), the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate, 18 U.S.C. §§ 371, 1035, 1347, 1349, and/or 42 U.S.C. § 1320a-7b (as well as several other offenses), if the violation or conspiracy relates to a health care benefit program.[1]

---

[1] The term "health care benefit program" is defined at 18 U.S.C. § 24(b) to mean any public or private plan or contract, affecting commerce, under which any medical benefit, item, or

14.     The Defendant Assets identified in paragraph 1(a), approximately $720,930.94 seized from JP Morgan Chase account number 259721709, in the name of Cure, are also subject to civil forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the civil forfeiture of any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property. Section 1956 (a)(1)(A)(i) and (B)(i) makes it a crime to knowingly conduct, or attempt to conduct, a financial transaction with proceeds from "specified unlawful activity" with the intent to promote the specified unlawful activity and to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

## FACTS

15.     Specific details of the facts and circumstances supporting the forfeiture of the Defendant Assets have been provided by FBI Special Agent Tina L. Repp, who has been a Special Agent with the FBI for the past twenty years. Since 2014, Agent Repp has been assigned to the Tampa Field Office, Pinellas Resident Agency, where she has conducted white collar crime investigations. Agent Repp has personally participated in this investigation since late 2018. The following facts are based on Agent Repp's personal knowledge of this investigation, including a review of documents and computer records related to this investigation, witness interviews,

---

service is provided to any individual, including any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

and communications with others who have personal knowledge of the events and circumstances described below.

## I.   THE CRIMINAL CONSPIRACY

16.   Beginning in or about October 2017, and continuing until in or about April 2019, Geronimo conspired with others to defraud the Medicare Program ("Medicare"), a federal health benefit program providing free or below-cost health care benefits, including durable medical equipment ("DME"), which include, pertinently, braces (e.g., knee braces, back braces, shoulder braces, wrist braces, and other "off-the-shelf" braces).

17.   Specifically, Geronimo ran a telemarketing operation targeting Medicare-aged individuals through his company, Cure, in which he purchased "leads" generated by "marketers" and call centers, and converted the "leads" to doctors' orders by illegally bribing medical practitioners, under the guise of "telemedicine." In exchange for approximately $12,055,783, Geronimo, through Cure, sold the brace orders to a network of fraudulent DME supply companies owned and operated by co-conspirators. Through the DME "fronts," the co-conspirators submitted the illegal and fraudulent claims to Medicare, and received millions of dollars in Medicare reimbursements.

### a.   Medicare's Coverage of Durable Medical Equipment

#### 1.   *Medicare Part B*

18.   At all times relevant, Medicare was a federal health benefit program that provided free or below-cost health care benefits to certain individuals, primarily

the elderly, blind, and disabled.

19.     Medicare "Part B" covered outpatient care and supplies, including DME. However, Medicare Part B only covered DME when the equipment was medically necessary and ordered by licensed medical doctors or other qualified health care providers.

20.     Medicare "beneficiaries" were those individuals that received Medicare benefits. Beneficiaries could only receive Medicare-covered DME from suppliers that were enrolled in Medicare.

21.     The United States Department of Health and Human Services, through its agency, Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as processing Medicare claims and enrolling DME suppliers into the Medicare program.

22.     Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC and (ii) Noridian Healthcare Solutions (collectively referred to as the "DME MACs").

2.      *Supplier Enrollment in Medicare Part B*

23.     A different MAC, Palmetto GBA, LLC, also referred to as the National Supplier Clearinghouse ("NSC") MAC, handled the enrollment of DME suppliers into Medicare. The NSC MAC was the single entity responsible for issuing or revoking Medicare supplier billing privileges for DME suppliers.

24.     To enroll in Medicare Part B, DME suppliers were required to submit a completed enrollment application—meaning the "Form CMS-855S"—to Medicare.

25.     The Form CMS-855S listed many standards necessary to obtain and retain Medicare billing privileges as a DME supplier. Specifically, DME suppliers were required to provide complete and accurate information on the Form CMS-855S and report any changes to such information to the NSC MAC within 30 days. In addition, the standards for DME suppliers included the following requirements:

    a.  An authorized individual (one whose signature is binding) must sign the application for billing privileges;

    b.  DME suppliers were prohibited from direct solicitation to Medicare beneficiaries;

    c.  DME suppliers had to fill orders from their own inventory or, otherwise, were to contract with another company for the purchase of items to fill orders;

    d.  DME suppliers had to maintain a staffed physical facility accessible to the public at least thirty hours per week, with visibly posted hours of operation;

    e.  DME suppliers had to disclose any person having an ownership, financial, or control interest in the supplier;

    f.  DME suppliers must not convey or reassign a supplier number (*i.e.*, the supplier may not sell or allow another entity to use its Medicare billing number); and

    g.  All DME suppliers must be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number.

26.     The Form CMS-855S required applicants to disclose to Medicare any individual or organization with an ownership interest, a financial interest, or

managing control of a DME supplier. This included (i) anyone with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) anyone with a partnership interest in the DME supplier, regardless of the percentage of ownership, (iii) any organizations with "managing control" over the DME supplier, as well as (iv) any and all "managing employees."

27.     "Managing employee" was defined on the Form CMS-855S (and elsewhere) as any general manager, business manager, administrator, director, or other individual who exercised operational or managerial control over, or who, directly or indirectly, conducted the day-to-day operations of the DME supplier. This included anyone under contract or through some other arrangement, whether or not the individual was a "W-2 employee" of the DME supplier.

28.     The Form CMS-855S also required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)[.]

***

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

29.     To enroll in Medicare, DME suppliers were required to complete an accreditation process by an organization approved by CMS. One CMS-approved organization that could perform such accreditation was known as the Board of Certification/Accreditation. The Board of Certification/Accreditation had a set of standards that DME suppliers had to meet for accreditation, which were tested at on-site inspections and random re-inspections.

30.     The NSC MAC also conducted surprise on-site inspections for Medicare enrollment, which helped verify the information disclosed in the Form CMS-855S and supporting documents. An authorized site inspector would interview staff seeking, among other information, a complete list of all owners and managers and whether they or any of their relatives owned other medical entities.

31.     The NSC MAC inspection also involved a review of any on-site DME inventory. DME suppliers that did not maintain their own inventory could be asked to produce a contract with a third-party vendor, such as a DME "drop-shipping" company.

32.     Further, the NSC MAC inspection inquired about marketing efforts including, pertinently, direct solicitation or the utilization of any third-party to solicit beneficiary referrals via telephone.

33.     All Medicare-enrolled DME suppliers were subject to random re-inspections. During a re-inspection, an inspector could make the same inquiries noted above, request supporting documentation, and seek follow up information from the DME supplier. Failure to comply could result in the suspension or revocation of Medicare billing privileges.

### 3.     Billing Medicare for DME Claims

34.     Physicians, clinics, and other health care providers, including DME suppliers (collectively, "Providers") that provided DME supplies to beneficiaries were able to apply for and to obtain unique identification numbers allowing them to bill Medicare. Such unique identification numbers included, pertinently, (i) a "National Provider Identifier" ("NPI") and (ii) a "Provider Transaction Access Number" ("PTAN"). The NSC MAC was responsible for issuing PTANs to a DME supplier after approving its Form CMS-855S (the Medicare enrollment application).

35.     Providers that received NPIs and/or PTANs could file claims with Medicare to obtain reimbursement for medically necessary services or supplies provided to beneficiaries.

36.     Under Medicare Part B, claims for DME supplies could be submitted for payment to the DME MACs through a system known as an "Electronic Data Interchange," which allowed DME suppliers to transmit claims to Medicare electronically.

37.     To enroll in electronic claims submissions, Medicare required that DME suppliers complete a Common Electronic Data Interchange agreement with

the DME MACs. The Common Electronic Data Interchange agreement required DME suppliers to agree to several terms and conditions, including, for example, that it would submit accurate, complete, and truthful claims. They also had to agree that, because claims were paid from federal funds, anyone who misrepresented or falsified any record or other information relating to any submitted claims could be subject to a fine and/or imprisonment under Federal law.

38.     To submit DME claims to Medicare, the DME supplier needed to report: (a) the type of service provided using a "Healthcare Common Procedure Coding System" code; (b) the date of service or supply; (c) the referring physician's NPI; (d) the charge for such services; (e) patient's diagnosis; (f) the NPI and PTAN for the DME supplier seeking reimbursement; and (g) certification that the supplies were medically necessary.

39.     Before submitting a claim to the DME MAC, the DME supplier also need certain information on file, including: (a) written documentation of a verbal order or a preliminary written order from a treating physician; (b) a detailed written order from the treating physician; (c) information from the treating physician concerning the beneficiary's diagnosis; and (d) proof of delivery of the orthotic brace to the beneficiary.

### 4.     *Beneficiary Copayments and Deductibles*

40.     Assigned claims were those for which the Provider obtained payments directly from the MAC. In order for a claim to be classified as such, the Provider agreed to accept the MAC's determination as to the billed items allowable charge

and accept 80 percent of that amount as Medicare's complete financial obligation. The remaining 20 percent was the responsibility of the beneficiary. This portion of the cost of an item or service which the Medicare beneficiary must pay was called the beneficiary's copayment.

41.    The Medicare "deductible" was the amount that the beneficiary must pay before Medicare will pay for any items or services for that individual.

42.    Providers were not permitted to routinely waive copayments and deductibles.

<em>5.    Proper Telehealth Services for Medicare Beneficiaries</em>

43.    Telemedicine was a means of connecting patients to providers via a telecommunications technology, such as video-conferencing. Telemedicine companies hired physicians and other providers to furnish telemedicine services to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. In order to generate revenue, telemedicine companies typically either billed the Medicare program or other health insurance program, or offered a membership program to patients.

44.    Medicare Part B covered expenses for specified telehealth services of certain requirements were met. These requirements included, among others: (a) that the beneficiary was typically located in a rural area (meaning outside a "Metropolitan Statistical Area" or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office

or a specified medical facility – not at home – during the telehealth service furnished by a remote practitioner.

**b.** **Overview of the Conspiracy**

*1.* *The Ever Prime Conspirators' Creation of Fraudulent DME Fronts*

45. Ever Prime Concepts, Inc. was a California company principally owned and controlled by conspirators Charles Burruss and Ardalaan "Armani" Adams (collectively, "Ever Prime conspirators").

46. Ever Prime purported to offer management services to companies selling DME. In reality, Ever Prime was a shell company used to operate a fraudulent network of affiliated DME supply companies, or DME "fronts." At least 20 of Ever Prime's DME fronts operated in the Middle District of Florida.

47. The DME fronts were created to facilitate the conspirators' billing of false and fraudulent DME claims to Medicare and other federal health benefit programs for DME that was not medically necessary. Numerous DME fronts were acquired and created for the purpose of, among others, spreading illegal DME claims across many entities to evade Medicare scrutiny. The availability of multiple DME fronts was also necessary to ensure uninterrupted continuation of the fraud.

48. To dupe inspectors to secure Medicare-billing privileges for the DME Fronts, sham inventory contracts were executed between the DME fronts and Magic Medical, a fake, non-operational DME drop-shipping company.

49. The conspirators submitted false and fraudulent forms and supporting documentation to secure eligibility, in defiance of the express warnings on the forms

regarding criminal and civil penalties for lying to Medicare to gain or to maintain enrollment.

50.     The conspirators also created bogus patient records for fictitious patients for the DME fronts, and presented, or caused the presentation of, sham inventory contracts, bogus patient records, and other false and misleading information during and in connection with inspections.

51.     The conspirators further concealed from Medicare and others, that Adams and Burruss owned, controlled, held financial interest in, and managed the DME fronts, including through Ever Prime.

52.     Adams and Burruss were strategically left off the Forms CMS-855S, which requires disclosure of owners and managing employees. Instead, Ever Prime falsely and fraudulently reported on these enrollment forms the names of "straw" or "nominee" owners. These straw or nominee owners had no meaningful involvement in the operation of the DME fronts.

53.     The Ever Prime conspirators would fund the straw owners' "purchase" of the DME fronts by funneling money to straw owners at or around the inception of a new DME front. The straw owners, in turn, used some or all of this money to fund bank accounts associated with the DME front. These layered transactions created the appearance that the straw owners owned the DME fronts; however, the Ever Prime conspirators actually owned, controlled, and managed the DME fronts.

54.     In addition to listing these straw owners on Medicare enrollment applications (*i.e.*, Forms CMS-855S), the Ever Prime conspirators caused the listing

of the straw owners on Florida corporate records, and other documents related to the DME fronts.

55.     During and in relation to inspections, the Ever Prime conspirators made, or caused to be made, false statements about the ownership and management of the DME fronts. This subterfuge facilitated Medicare's approval of the DME fronts.

2.     *Submission of DME Claims to Medicare Obtained Through Illegal Bribes and Kickbacks*

56.     To secure high volumes of DME claims, Adams and Burruss used illegal bribes and kickbacks, in violation of the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)).

57.     Specifically, Adams and Burruss agreed to arrange, and did arrange, to purchase thousands of DME claims from so-called "marketers," including, among others, Cure, a "marketing" company in Newport Beach, California owned and operated by Geronimo.

58.     Cure was a telemarketing operation that targeted the Medicare-aged population to promote, and generate orders for, DME, pertinently, braces.

59.     Geronimo, through Cure, purchased "leads" generated by "marketers" and call centers, including many located overseas. One of Cure's main lead sources was co-conspirator C.H., who owned and operated Company-1, located in the Middle District of Florida.

60.     "Leads" consisted of patient data and recordings of calls with consumers, who were mostly Medicare beneficiaries. To form a "lead," the call center representatives called the beneficiaries to inquire about, among other information, the beneficiaries' Medicare eligibility, their health status, and whether they wanted DME braces. The representatives harvested this information along with beneficiaries' personally identifying information to build the "lead." Cure's financial records show substantial payments to so-called "lead generators."

61.     Geronimo, through Cure, then converted the "leads" to brace orders. Cure caused the transmission of Medicare beneficiaries' DME brace orders to doctors and other medical practitioners through purported "telemedicine" partners. Cure, including through intermediaries, bribed doctors and other medical practitioners to sign the brace orders under the guise of "telemedicine," in violation of federal anti-kickback laws and other criminal statutes. The medical practitioners signed the DME brace orders without ever contacting the Medicare beneficiaries, rather than conducting compliant telehealth consultations.

62.     The "telemedicine" vendors then transmitted the signed DME brace orders, secured through illegal bribes, to Cure. The brace orders were sometimes referred to as "completed doctors' orders" because they included all of the components necessary to present the claims to Medicare or other federal health benefit programs for payment.

63.     Cure sold or caused the sale of illegal brace orders to other conspirators, including Adams and Burruss, through Ever Prime.

18

64.     For example, on about the dates set forth below, the Ever Prime conspirators paid for illegal bribes in the approximate amounts listed below to Cure as inducement, direct and indirect, to cause medical practitioners to sign and to prescribe DME brace orders:

| On or About Date | Source Account | Purported "Marketing" Company | Approx. Amount |
|---|---|---|---|
| October 12, 2018 | Discovery Medical, JPMC -6270 | Cure, JPMC -1709 | $195,375 |
| October 19, 2018 | Layne Medical, JPMC -6270 | Cure, JPMC -1709 | $79,300 |

65.     To disguise the illegal sale of doctors' orders, Geronimo, through Cure, used sham invoices that falsely identified the charges as, for example, "search engine optimization" or "social media marketing."

66.     For example, in or about May 2018, the Ever Prime conspirators received a falsified invoice from Cure, in the amount of $30,000 for "search engine optimization" and other services, when in truth, the charges were for the Ever Prime conspirators' purchase of illegal DME claims that Cure had induced by bribing medical practitioners.

67.     Contrary to the invoices, Adams and Burruss were illegally purchasing the signed doctors' orders from Geronimo on a per-item basis for up to approximately $375 per brace.

68.     Cure's bank account revealed extensive financial ties with Ever Prime. Practically all deposits to Cure's bank account came from known Ever Prime DME

fronts. Between February 2018 and December 2018, deposits from the Ever Prime DME fronts totaled $4,345,694; this represented over 97% of the total deposit items (excluding incoming wires) for the period.

69.    Adams and Burruss paid Geronimo, through Cure, using the operating bank accounts for DME fronts, including the following fronts located or established in the Middle District of Florida: (i) American Bracing Solutions, Inc.; (ii) Back Braces Plus, Inc. (iii) Caring for Your Pain Bracing; (iv) Discovery Medical Supply; (v) Jackson Medical Supply; (vi) Layne Medical Supply; (vii) LJH Medical Solutions; (viii) Lucky Medical Supply; and (ix) Westside Medical Bracing, Inc.

70.    Bank records and other documents revealed numerous financial transactions through which Adams and Burruss illegally purchased, or caused the illegal purchase of, DME claims from Cure, as set forth, at least in part, in the table below:

| DME Front | Payments to Cure |
|---|---|
| American Bracing Solutions, Inc. | $25,000 |
| Back Braces Plus, Inc. | $25,000 |
| Caring For Your Pain Bracing | $25,000 |
| Discovery Medical Supply | $508,626 |
| Jackson Medical Supply | $25,000 |
| Layne Medical Supply | $397,840 |
| LJH Medical Solutions | $284,100 |
| Lucky Medical Supply, Inc. | $25,000 |
| Westside Medical Bracing, Inc. | $687,600 |

71.    After the DME fronts illegally obtained the doctor's orders from Cure and other "marketers," the Ever Prime conspirators, in turn, submitted the claims, or caused them to be submitted, to Medicare for reimbursement. The Ever Prime

conspirators did so even if the DME products lacked medical necessity; they did so even, at times, when the DME products were never even delivered to the Medicare beneficiary.

72.     The Ever Prime conspirators then directed, or caused to be directed, payments from Medicare (and other federal health benefit programs) for the illegal DME claims to be deposited in bank accounts created for the DME fronts. The Ever Prime conspirators transferred, or caused the transfer of, millions of dollars from the DME front bank accounts to other accounts, including the bank accounts of "marketers" like Cure, to promote and perpetuate the scheme to defraud.

73.     The Ever Prime conspirators also routinely and unlawfully waived patient deductibles and copayments so as to induce Medicare beneficiaries to accept otherwise costly DME products reimbursed by the Medicare program. By forgiving their financial obligations, the beneficiaries were unlawfully induced in violation of the Federal Anti-Kickback Statute.

## II.   THE DEFENDANT ASSETS CONSTITUTE PROCEEDS OF A HEALTH CARE FRAUD CONSPIRACY AND/OR ARE PROPERTY INVOLVED IN MONEY LAUNDERING

### a.   The Defendant Assets Constitute Proceeds of a Health Care Fraud Conspiracy

74.     The information above demonstrates that all of the Defendant Assets identified in paragraph 1 constitute proceeds, or are traceable to proceeds, of a health care fraud conspiracy.

75.     The Ever Prime DME fronts were created through fraud; their sole purpose was to submit false DME claims to Medicare. Accordingly, the very creation of the DME fronts constituted a crime, and all proceeds from the DME fronts represented proceeds of federal health care offenses. Furthermore, the Ever Prime conspirators illegally used the fraudulent DME fronts to submit numerous claims to Medicare for DME that were not medically necessary. Medicare paid these funds directly to the DME fronts' bank accounts.

76.     In turn, the Ever Prime DME fronts paid kickbacks to Geronimo, through Cure, for his role in the scheme: illegally bribing doctors and medical practitioners to sign doctors' orders for DME that were not medically necessary, under the guise of "telemedicine."

77.     Thus, the funds earned by Geronimo, through Cure, including the assets identified in paragraph 1(a), approximately $720,930.94 seized from JP Morgan Chase account number 259721709, held in the name of Cure, were proceeds of a conspiracy to defraud Medicare.

78.     Additionally, the assets described in paragraphs 1(b) and 1(c), real properties located at 125 Lakeside Drive, Buena Park, California 90621 and 9 Winward Way, Buena Park, California 90621, were purchased by Geronimo during

or immediately after the commission of the conspiracy,[2] and constitute, or are derived from, proceeds of the conspiracy.

79. Likewise, the assets described in paragraph 1(d) and 1(e), a 2020 Land Rover, Range Rover HSE, Vehicle Identification Number: SALGS5SE7LA592843, registered to Katrina Geronimo, and a 2019 Mercedes-Benz S63 AMG, Vehicle Identification Number: WDDUG8JBXKA438216, registered to Sajid Q. Geronimo, were purchased by Geronimo during or immediately after the commission of the conspiracy, and constitute, or are derived from, proceeds of the conspiracy.

80. Geronimo, the owner and operator of Cure, admitted that the currency, real property, and vehicles identified in paragraph 1 are proceeds, or are traceable to proceeds, of the conspiracy to commit health care fraud described above.

81. Specifically, in his plea agreement, Geronimo agreed that the funds identified in paragraph 1(a), approximately $720,930.94 seized from JP Morgan Chase account number 259721709, in the name of Cure, constituted proceeds traceable to the health care fraud offense to which he pled guilty. Doc. 6 at 6, Criminal Case. Geronimo also agreed to the forfeiture of these funds. *Id.*

82. Geronimo also agreed to forfeit to the United States, "any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(7)." *Id.* Section 982(a)(7) provides for the forfeiture of property constituting or

---

[2] The Lakeside Drive property was purchased by Geronimo and Katrina Geronimo on or about August 8, 2019. The Winward Way property was purchased by Geronimo and Katrina Geronimo on or about October 15, 2018.

derived, directly or indirectly, from gross proceeds traceable to the commission of a Federal health care fraud offense. Geronimo agreed to the forfeiture of said assets "pursuant to any federal criminal, civil, judicial, or administrative forfeiture action." *Id.* at 8.

83.     Geronimo further agreed that the forfeiture provisions of the plea agreement would survive Geronimo, notwithstanding the abatement of any underlying criminal conviction that could occur after execution of the plea agreement. *Id.* at 10. Geronimo also agreed that "the forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, are final." *Id.*

84.     Additionally, Geronimo admitted in a sworn Financial Disclosure Statement completed in his criminal case that the real properties referenced in paragraphs 1(b) and 1(c), and the vehicles referenced in paragraphs 1(d) and 1(e),[3] were purchased with proceeds of the conspiracy.

85.     After a preliminary order of forfeiture was entered, forfeiting the real properties referenced in paragraphs 1(b) and 1(c), and the vehicles identified in paragraphs 1(d) and 1(e) (Doc. 26, Criminal Case), Geronimo and Katrina Z.

---

[3] In the Financial Disclosure Statement, Geronimo identified the vehicles as a "2019 Mercedes Benz" and a "2019 CLA Mercedes Benz." The correct make and model of the vehicles are set forth in paragraphs 1(d) and 1(e).

Geronimo, titled owners of the real properties, agreed that they would pay the United States a total of $1,000,000 to be forfeited in lieu of the real properties. The funds in paragraphs 1(b) and 1(c) are thus traceable to proceeds of the conspiracy.

86.     On April 22, 2021, the Court entered a Final Order of Forfeiture, forfeiting the funds identified in paragraphs 1(a) through 1(c), as well as the vehicles referenced in paragraph 1(d) and 1(e), and declaring that clear title to said assets was vested in the United States. Doc. 61, Criminal Case. The United States subsequently sold the vehicles, and the proceeds of the vehicle sales, identified in paragraphs 1(d) and 1(e), are thus traceable to proceeds of the conspiracy.

### b.     The Defendant Assets in Paragraph 1(a) Also Constitute Property Involved in Money Laundering

87.     In addition to constituting proceeds of a criminal health care fraud conspiracy, the Defendant Assets in paragraph 1(a), which consists of funds seized from the bank account owned by marketer Cure, are also property involved in money laundering, or are traceable to such property.

88.     While Cure intended to appear as a legitimate marketing business, its true purpose was to sell doctors' orders to the DME fronts and, in turn, receive illegal kickbacks from the DME fronts. The transfer of funds from the Ever Prime conspirators to Cure was designed to conceal and disguise the source and nature of the fraud proceeds, so as to give them the appearance of legitimacy. Because Cure facilitated the money laundering, it and all of its assets, particularly its bank account, are subject to forfeiture as property involved in money laundering.

## III. CONCLUSION

89.    As required by Supplemental Rule G(2)(f), the facts set forth above

support a reasonable belief that the Government will be able to meet its burden of

proof at trial. Specifically, they support a reasonable belief that the Government will

be able to show by a preponderance of the evidence that the Defendant Assets are

derived from proceeds of a criminal conspiracy to commit health care fraud offenses

and defraud the United States and/or constitute property involved in money

laundering.

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States of

America, requests that this Court initiate a process of forfeiture against the

Defendant Assets, and duly notice all interested parties to appear and show cause

why the forfeiture should not be decreed. The United States further requests the

Court order the Defendant Assets forfeited to the United States for disposition

according to law and grant the United States such other and further relief as this case

may require.

Dated: October 14, 2021          Respectfully submitted,

                                 KARIN HOPPMANN
                                 Acting United States Attorney

                          By:    _____
                                 JAMES A. MUENCH
                                 Assistant United States Attorney
                                 Florida Bar Number 472867
                                 400 North Tampa Street, Suite 3200
                                 Tampa, Florida 33602
                                 (813) 274-6000 – telephone
                                 E-mail: james.muench2@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Tina L. Repp, declare under penalty of perjury that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this $\underline{14}$ day of October, 2021.

TINA L. REPP
Special Agent
Federal Bureau of Investigation

27